1  BRETT A. AXELROD, ESQ.
   Nevada Bar No. 5859
2  **FOX ROTHSCHILD LLP**
   1980 Festival Plaza Drive, Suite 700
3  Las Vegas, Nevada 89135
   Telephone: (702) 262-6899
4  Facsimile: (702) 597-5503
   Email: baxelrod@foxrothschild.com
5  *Counsel for Debtors*

6

| Electronically Filed October 28, 2020 |
| --- |

7                **UNITED STATES BANKRUPTCY COURT**

8                        **DISTRICT OF NEVADA**

9  In re                                    Case No. BK-S-20-12814-mkn

10 RED ROSE, INC.,                          Jointly Administered with
                                            Case No. BK-S-20-12815-mkn
11 ☐ Affects Beachhead Roofing and Supply, Inc.   Case No. BK-S-20-12816-mkn
   ☐ Affects California Equipment Leasing    Case No. BK-S-20-12818-mkn
12    Association, Inc.                      Case No. BK-S-20-12819-mkn
   ☐ Affects Fences 4 America, Inc.          Case No. BK-S-20-12820-mkn
13 ☐ Affects James Petersen Industries, Inc.  Case No. BK-S-20-12821-mkn
   ☐ Affects PD Solar, Inc.                  Case No. BK-S-20-12822-mkn
14 ☐ Affects Petersen Roofing and Solar LLC  Case No. BK-S-20-12823-mkn
   ☐ Affects Petersen-Dean, Inc.             Case No. BK-S-20-12824-mkn
15 ☐ Affects PetersenDean Hawaii LLC          Case No. BK-S-20-12825-mkn
   ☐ Affects PetersenDean Roofing and Solar  Case No. BK-S-20-12826-mkn
16    Systems, Inc.                          Case No. BK-S-20-12827-mkn
   ☐ Affects PetersenDean Texas, Inc.        Case No. BK-S-20-12829-mkn
17 ☐ Affects Red Rose, Inc.                  Case No. BK-S-20-12831-mkn
   ☐ Affects Roofs 4 America, Inc.           Case No. BK-S-20-12833-mkn
18 ☐ Affects Solar 4 America, Inc.
   ☐ Affects Sonoma Roofing Services, Inc.
19 ☐ Affects TD Venture Fund, LLC            Chapter 11
   ☐ Affects Tri-Valley Supply, Inc.
20 ☒ Affects All Debtors                     **DECLARATION OF JEFFREY C.
                                            PEREA IN SUPPORT OF DEBTORS'
21                                           MOTION FOR APPROVAL OF
                                            COMPROMISE, PURSUANT TO FED. R.
22                                           BANKR. P. 9019, BY AND AMONG
                                            DEBTORS, ACF FINCO I, LP AND THE
23                                           OFFICIAL COMMITTEE OF
                                            UNSECURED CREDITORS
24

25

26                                           Hearing Date:    OST PENDING
                                            Hearing Time:    OST PENDING
27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1

I, Jeffrey C. Perea, being duly sworn, hereby depose and declare under penalty of perjury:

1.    I am over the age of 18, am mentally competent, and if called upon to testify as to the statements made herein, could and would do so.

2.    I am the Chief Restructuring Officer of Petersen-Dean, Inc.

3.    I am authorized to make this declaration in support of the *Debtors' Motion for Approval of Compromise, Pursuant to Fed. R. Bankr. P. 9019, by and among Debtors, ACF Finco I, LP and the Official Committee of Unsecured Creditors* (the "**Motion**").[1]  The Motion seeks approval of the *Claims Settlement and 363 Sale Support Agreement* ("**Settlement Agreement**") by and between Debtors, ACF Finco I, LP ("**ACF**"), and the Official Committee of Unsecured Creditors (the "**Committee**" and, collectively with Debtors and ACF, the "**Parties**").  The Debtors' DIP lender, LS DE LLC and LSQ Funding Group, L.C. (collectively, the "**DIP Factor**") has given limited consent to specific provisions in the Settlement Agreement, providing for segregation and use of certain identified assets that constitute its collateral, on the terms set forth in the *Limited Consent of DIP Factor to Segregation and Use of Proceeds of Identified Assets* (the "**DIP Factor Limited Consent**"), attached to end of the Settlement Agreement.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**.

4.    Certain of those Debtors comprised of PDI, Solar 4, PD Texas, PD Solar, Sonoma, Red Rose, PD Roofing, Tri-Valley, California Equipment, Fences 4, Roofs 4 and PD Hawaii are borrowers (the "**Borrowing Debtors**") under that certain secured revolving credit facility from ACF up to an aggregate principal amount of Thirty-Five Million Dollars ($35,000,0000) (the "**Loan**") pursuant to that certain Loan and Security Agreement dated June 29, 2017, and all amendments, restatements, supplements and other modifications thereto (the "**Loan Agreement**"; all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement).  See Exhibit 1, p. 1.

5.    The Loan Agreement, among other things, granted ACF a security interest in all of Borrowing Debtors' personal property in order to secure Borrowing Debtors' obligations under the

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

Active\115656168

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Loan Agreement (the "**Collateral**"), including, but not limited to: all cash, Money (as defined in Section 1-201(24) of the UCC), Accessions, Accounts (including without limitation all Receivables and unearned premiums with respect to insurance policies insuring any of the Collateral and claims against any Person for loss of, damage to, or destruction of any or all of the Collateral), Certificates of Title, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Health-Care-Insurance Receivables, Instruments, Inventory, Investment Property, Letter-Of-Credit Rights, Proceeds, Records, Software and Supporting Obligations, and all rights to payment for money or funds advanced or sold.  See Exhibit 1, pp. 1-2.

6.      ACF contends that the Borrowing Debtors' obligations to ACF are further secured by that certain Collection Account Agreement, dated June 16, 2017, entered into between Borrowing Debtors, ACF and Wells Fargo Bank, National Association (the "**Bank**"), pursuant to which Borrowing Debtors granted ACF control over all of Borrowing Debtors' deposit accounts held at the Bank.  See Exhibit 1, p. 2.

7.      ACF contends that as a result of a covenant violation arising from a loan to James P. Petersen ("**J. Petersen**"), the founder of PDI, and in exchange for an interest rate reduction in the Loan and an extension of the Revolving Credit Termination Date under the Loan Agreement, and certain other covenant relief, J. Petersen executed that certain Amended and Restated Continuing Guaranty dated June 22, 2018 (together with all amendments, restatements, supplements and other modifications thereto, the "**Petersen Guaranty**"), whereby J. Petersen agreed to guarantee the Borrowing Debtors' obligations under the Loan, the Loan Agreement and all other agreements entered into in connection with the Loan by Borrowing Debtors, as amended, restated, supplemented or otherwise modified from time to time (the "**Loan Documents**"), including without limitation, all promissory notes and security agreements (the "**Petersen Guaranteed Obligations**").  See Exhibit 1, p. 2.

8.      ACF contends that in exchange for accommodations by ACF to the Borrowing Debtors, TD Venture executed that certain Continuing Guaranty (Secured by Deed of Trust) dated November 15, 2018 (together with all amendments, restatements, supplements and other modifications thereto, the "**TD Venture Guaranty**" and, together with the Petersen Guaranty, the

3

"**Guaranties**"), whereby TD Venture agreed to guarantee the Borrowing Debtors' obligations under the Loan, the Loan Agreement and all other Loan Documents (the "**TD Venture Guaranteed Obligations**" and, together with the Petersen Guaranteed Obligations, the "**Guaranteed Obligations**"). See Exhibit 1, p. 2.

9.      TD Venture is an affiliate of the other Debtors, however, TD Venture has no employees, nor does it install any roofing/solar projects. See Exhibit 1, p. 2.

10.     The obligations under the Petersen Guaranty are secured by (i) that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by J. Petersen and Tricia Yeh Petersen ("**T. Petersen**" and, together with J. Petersen, the "**Trustors**") in favor of Lender (the "**Truckee Deed of Trust**"), encumbering that certain property located in the County of Placer, State of California, more particularly described in the Truckee Deed of Trust (the "**Truckee Property**"), and (ii) that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by the Trustors in favor of Lender (the "**Aptos Deed of Trust**"), encumbering that certain property located in the County of Santa Cruz, State of California, more particularly described in the Aptos Deed of Trust (the "**Aptos Property**" and, together with the Truckee Property, the "**Trustors' Properties**"). See Exhibit 1, pp. 2-3.

11.     The obligations under the TD Venture Guaranty are secured by that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by TD Venture in favor of Lender (the "**Hawaii Mortgage**"), encumbering that certain property located in the County of Maui, State of Hawaii, more particularly described in the Hawaii Mortgage (the "**Hawaii Property**" and, together with the Trustors' Properties, collectively the "**Properties**"). See Exhibit 1, p. 3.

12.     TD Venture also owns an unencumbered membership interest in the Calistoga Ranch Club, a California Nonprofit Mutual Benefit Corporation, specifically identified as being Membership No. 035 (the "**Membership Interest**"). See Exhibit 1, p. 3.

13.     The Loan is currently in default under the Loan Documents. The various defaults alleged by the Lender, as well as various allegations of improprieties that they have made against J. Petersen, are set forth in detail in the *Declaration of Andres Pinter* [Dkt. 45, Case no. BK-S-20-

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

4

12814-mkn]. The Lender has also opposed the Debtors' use of cash collateral on a final basis pursuant to that certain *Secured Creditor ACF Finco I, LP's Opposition to Final Order on Emergency First Day Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 552 and Fed. R. Bankr. P. 4001(b) and 4001(d): (I) Determining Extent of Cash Collateral; (II) Authorizing Borrowing Debtors to Use Cash Collateral and Provide Adequate Protection; (III) Granting Related Relief; and (IV) Scheduling Final Hearing* [Dkt. 440, Case no. BK-S-20-12814-mkn]. See Exhibit 1, p. 3.

14.    On July 31, 2010, the Bankruptcy Court entered its *Final Order (I) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Granting Adequate Protection Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, (III) Granting Liens and Superpriority Claims, and (IV) Modifying the Automatic Stay, And (V) Scheduling a Final Hearing* [Dkt. 601, Case no. BK-S-20-12814-mkn] (the "**Cash Collateral Order**"). See Exhibit 1, p. 3.

15.    As of the Petition Date, ACF was owed approximately Twenty-Eight Million Five Hundred Forty-Three Thousand Eight Hundred Fifty-Four Dollars ($28,543,854) plus professional fees and costs (the "**ACF Secured Claim**"), which sum is secured by a valid, perfected and enforceable first priority security interest in the Collateral. See Exhibit 1, p. 3.

16.    After considerable negotiations, Trustors, TD Venture and ACF (collectively, the "**Settling Parties**") determined that it is in their best interests to settle all of their respective disputes and controversies, including all of the Guaranteed Obligations and cash collateral disputes, and the Settling Parties executed that certain Settlement Agreement and Release Of All Claims (the "**TD Venture Settlement Agreement**"), which subject to the Bankruptcy Court's approval with respect to TD Venture, resolves all disputes between the Settling Parties, including the Guaranteed Obligations. See Exhibit 1, p. 3.

17.    On August 19, 2020, the Debtors filed that certain *Debtors' Motion for Approval of Compromise, Pursuant to Fed. R. Bankrk. P. 9019, by and among TD Venture Fund, LLC, James P. Petersen, Tricia Yeh Petersen and ACF Finco I, LP* [Dkt. 739, Case no. BK-S-20-12814-mkn] (the "**TD Venture 9019 Motion**"). See Exhibit 1, p. 4.

18.    On August 26, 2020, the Committee was appointed in the TD Venture chapter 11

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\115656168

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

case pursuant to that certain *Amended Notice of the Official Committee of Unsecured Creditors for the Estates of all Captioned Debtors* [Dkt. 811, Case no. BK-S-20-12814-mkn]. See Exhibit 1, p. 4.

19.     The Committee has objected to the TD Venture 9019 Motion filing that certain *Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Approval of Compromise, Pursuant to Fed. R. Bankrk. P. 9019, by and among TD Venture Fund, LLC, James P. Petersen, Tricia Yeh Petersen and ACF Finco I, LP* on September 9, 2020 [Dkt. 954, Case no. BK-S-20-12814-mkn] (the "**Committee Objection**"). See Exhibit 1, p. 4.

20.     There is extensive discovery scheduled in connection with the TD Venture 9109 Motion and Committee Objection.  See *Scheduling Order re: Hearing on [TD Venture 9019 Motion]* [Dkt. 1081, Case no. BK-S-20-12814-mkn], and *Order Approving Stipulation to (A) Modify Discovery Deadlines for Scheduling Order Re: Hearing on [TD Venture 9019 Motion] and (B) Extend the Deadline to Object to the Debtors' Bid Procedures* [Dkt. 1211, Case no. BK-S-20-12814-mkn] (collectively, the "**Scheduled Discovery**").

21.     The Debtors have continued to engage in extensive marketing efforts for the sale of substantially all of the Debtors' assets.  See Exhibit 1, p. 4.

22.     On October 12, 2020, the Debtors and ACF entered into a non-binding Letter of Intent (the "**Letter of Intent**") for ACF to purchase substantially all of the assets of Debtors (the "**Assets**"), except those certain assets of Debtors specifically identified as, and agreed by the parties to be, excluded assets in a definitive asset purchase agreement containing terms and conditions satisfactory to the Debtors and ACF (the "**Stalking Horse Agreement**"), under Section 363 of the Bankruptcy Code, free and clear of any interest in such property other than the DIP Factoring and DIP Liens, as such terms are defined in the Letter of Intent (the "**363 Sale**").  Without limiting the foregoing, the Assets being sold pursuant to the 363 Sale shall include, without limitation, all Debtors' bankruptcy estates' claims and causes of action under Chapter 5 of the Bankruptcy Code (e.g., preference, fraudulent conveyance and avoidance actions and claims), and all other claims and causes of action that constitute property of the Debtors' bankruptcy estates under Section 541 of the Bankruptcy Code, and/or any other applicable federal or state law, and all proceeds and rights to

Active\115656168

proceeds therefrom (collectively, the "**Chapter 5 Claims**").  See Exhibit 1, p. 4.

23.    On October 19, 2020, the Debtors filed their *Motion for Order Pursuant to Sections 105(A), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure Approving and Authorizing: (A) Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Assets to the Stalking Horse Bidder; (B) Form and Manner of Notice of the Sale Hearing; (C) Sale of Substantially all of the Debtors' Assets Free and Clear of Liens Claims, Encumbrances, and Other Interests, Except the DIP Factoring and as Provided in the Stalking Horse Agreement; (D) Purchase Agreement Relating Thereto; (E) Assumption and Assignment of Certain of the Debtors' Executory Contracts and Unexpired Leases Related Thereto; and (F) Related Relief* [Dkt. 1172, Case no. BK-S-20-12814-mkn] (the "**Bidding Procedures Motion**").  A copy of the Letter of Intent is annexed as Exhibit G to the Bidding Procedures Motion.

24.    The Debtors have a limited liquidity window within which to continue to market and sell their assets as a going concern, and the terms for the Stalking Horse Agreement require the Debtors to maintain their business as a going concern through the date of closing of the proposed 363 Sale of the Assets.  See Exhibit 1, pp. 4-5.

25.    The Debtors' business and financial position has substantially deteriorated during the pendency of the Bankruptcy Case and given the exigent circumstances surrounding the Debtors, the Parties are extremely concerned that the Debtors will be required to liquidate through chapter 7 proceedings which will not maximize value for creditors if an auction is not conducted immediately for a 363 Sale of the Debtors' Assets in accordance with the timeline set forth in the Letter of Intent.  See Exhibit 1, p. 5.

26.    After significant negotiations among the Debtors, the Committee and ACF, the Parties have determined it is in their collective best interests to come to an agreement with respect to the treatment of the ACF Secured Claim, the Unsecured Creditors Claims and the various disputes among the Parties in the Bankruptcy Case, including without limitation, with respect to the TD Venture 9019 Motion and the Committee Objection, and each of the Parties now desire to resolve any and all such disputes and have agreed upon treatment of their respective claims,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Active\115656168

1   pursuant to the terms and conditions set forth in the Settlement Agreement.  See Exhibit 1, p. 5.

2          27.    As part of the negotiations among the Parties, the Committee has further

3   determined it is in the unsecured creditors' best interests to support the 363 Sale of the Assets

4   pursuant to the Stalking Horse Agreement, pursuant to the terms and conditions set forth in the

5   Settlement Agreement.  See Exhibit 1, p. 5.

6          28.    The Debtors believe that the Settlement Agreement is in the best interests of all of their

7   estates and creditors and therefore should be approved.  Specifically, if the Settlement Agreement is

8   approved, then the Parties can proceed promptly to the 363 Sale, thus saving significant not only legal

9   fees and expenses associated with an objection from the Committee, but also preventing the

10   liquidation of the Debtors under chapter 7 that would likely ensue from the delay engendered by

11   litigation.  The Debtors' business and financial position has substantially deteriorated during the

12   pendency of the Bankruptcy Case and given the exigent circumstances surrounding the Debtors, the

13   Parties are extremely concerned that the Debtors will be required to liquidate through chapter 7

14   proceedings which will not maximize value for creditors if an auction is not conducted immediately

15   for a 363 Sale of the Debtors' Assets in accordance with the timeline set forth in the Letter of Intent.

16   See Exhibit 1, pp. 4-5.

17          29.    By divesting the Hawaii Property and the Membership Interest through the TD

18   Venture Settlement Agreement, TD Venture will not only be able to reduce the balance of the Loan

19   for the collective benefit of the Borrowing Debtors' estates, but it will also shed non-income

20   producing assets that it does not have the financial wherewithal to maintain.

21          30.    With respect to the probability of success in litigation, the Debtors believe that Parties

22   have put forth solid arguments and evidence to support their positions with respect to the 363 Sale

23   and TD Venture 9019 Motion.  While the Debtors believe that the evidence presented thus far

24   demonstrated a reasonable likelihood of success on contested issues before the Court, there is always

25   uncertainty with litigation, and resolving the issues will provide Debtors with the ability to proceed

26   promptly to a resolution of the Bankruptcy Case via the 363 Sale, the TD Venture Settlement

27   Agreement, and the establishment of the Liquidating Trust in a manner that does not prejudice them,

28   their estates or any other creditor.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

31.     With respect to any difficulties to be encountered in the matter of collections, this factor does not apply to this Court's analysis of the Settlement Agreement, as there are no amounts owed to the Debtors which are affected by this settlement.

32.     If the Settlement Agreement is not approved or does not become effective for any reason, resolution of the pending disputes between the Parties not only will require a substantial investment of Debtors' time and resources (see Scheduled Discovery), but the ensuing delay will likely force a chapter 7 liquidation of the Debtors' assets to the detriment of the Debtors, their creditors and estates.

33.     When analyzing the paramount interest of the creditors and a proper deference to their reasonable views in the premises, it is of utmost importance to note that the Committee and the Debtors' largest creditor have approved the terms of the Settlement Agreement after extensive negotiations.  Moreover, the DIP Factor has given its Limited Consent to the Settlement Agreement. The terms of the Settlement Agreement were reached in good faith, and with the goal of reaching a compromised resolution so that the Bankruptcy Case can proceed to a prompt resolution.

I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed this 28th day of October, 2020.

        /s/Jeffrey C. Perea
        Jeffrey C. Perea

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9

# EXHIBIT 1

## CLAIMS SETTLEMENT AND 363 SALE SUPPORT
## AGREEMENT AND RELEASES

This Claims Settlement and 363 Sale Support Agreement and Releases (the "**Agreement**") is made as of this 28th day of October, 2020 (the "**Effective Date**"), by and among ACF FINCO I LP ("**ACF**"), Petersen-Dean, Inc. ("**PDI**"), Beachhead Roofing & Supply, Inc. ("**Beachhead**"), California Equipment Leasing Association, Inc. ("**California Equipment**"), Solar 4 America, Inc. ("**Solar 4**"), Fences 4 America, Inc. ("**Fences 4**"), James Petersen Industries, Inc. ("**JP Industries**"), PD Solar, Inc. ("**PD Solar**"), Sonoma Roofing Services, Inc. ("**Sonoma**"), Petersen Roofing and Solar LLC ("**Petersen Roofing**"), PetersenDean Texas, Inc. ("**PD Texas**"), Red Rose, Inc. ("**Red Rose**"), Roofs 4 America, Inc. ("**Roofs 4**"), Tri-Valley Supply, Inc. ("**Tri-Valley**"), Petersen Dean Hawaii LLC ("**PD Hawaii**"), Petersen Dean Roofing and Solar Systems, Inc. ("**PD Roofing**"), TD Venture Fund, LLC ("**TD Venture**" and, together with PDI, Beachhead, California Equipment, Solar 4, Fences 4, JP Industries, PD Solar, Sonoma, Petersen Roofing, PD Texas, Red Rose, Roofs 4, Tri-Valley, PD Hawaii and PD Roofing, collectively, the "**Debtors**" and each individually, a "**Debtor**"), and the Official Committee of Unsecured Creditors (the "**Committee**") appointed in the Bankruptcy Cases of the Debtors, as hereinafter defined.  ACF, the Debtors and the Committee may individually be referred to as a "**Party**" and, collectively as the "**Parties**."

## <u>RECITALS</u>

WHEREAS, on June 11, 2020 (the "**Petition Date**"), the Debtors filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court, District of Nevada (the "**Bankruptcy Court**"), in the bankruptcy case being jointly administered under Case No. BK-20-12814-mkn (collectively, the "**Bankruptcy Case**");

WHEREAS, the Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, certain of those Debtors comprised of PDI, Solar 4, PD Texas, PD Solar, Sonoma, Red Rose, PD Roofing, Tri-Valley, California Equipment, Fences 4, Roofs 4 and PD Hawaii are borrowers (the "**Borrowing Debtors**") under that certain secured revolving credit facility from ACF up to an aggregate principal amount of Thirty-Five Million Dollars ($35,000,0000) (the "**Loan**") pursuant to that certain Loan and Security Agreement dated June 29, 2017, and all amendments, restatements, supplements and other modifications thereto (the "**Loan Agreement**"; all capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement);

WHEREAS, the Loan Agreement, among other things, granted ACF a security interest in all of Borrowing Debtors' personal property in order to secure Borrowing Debtors' obligations under the Loan Agreement (the "**Collateral**"), including, but not limited to: all cash, Money (as defined in Section 1-201(24) of the UCC), Accessions, Accounts (including without limitation all Receivables and unearned premiums with respect to insurance policies

insuring any of the Collateral and claims against any Person for loss of, damage to, or destruction of any or all of the Collateral), Certificates of Title, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Health-Care-Insurance Receivables, Instruments, Inventory, Investment Property, Letter-Of-Credit Rights, Proceeds, Records, Software and Supporting Obligations, and all rights to payment for money or funds advanced or sold;

WHEREAS, ACF contends that the Borrowing Debtors' obligations to ACF are further secured by that certain Collection Account Agreement, dated June 16, 2017, entered into between Borrowing Debtors, ACF and Wells Fargo Bank, National Association (the "**Bank**"), pursuant to which Borrowing Debtors granted ACF control over all of Borrowing Debtors' deposit accounts held at the Bank;

WHEREAS, ACF contends that as a result of a covenant violation arising from a loan to James P. Petersen ("**J. Petersen**"), the founder of PDI, and in exchange for an interest rate reduction in the Loan and an extension of the Revolving Credit Termination Date under the Loan Agreement, and certain other covenant relief, J. Petersen executed that certain Amended and Restated Continuing Guaranty dated June 22, 2018 (together with all amendments, restatements, supplements and other modifications thereto, the "**Petersen Guaranty**"), whereby J. Petersen agreed to guarantee the Borrowing Debtors' obligations under the Loan, the Loan Agreement and all other agreements entered into in connection with the Loan by Borrowing Debtors, as amended, restated, supplemented or otherwise modified from time to time (the "**Loan Documents**"), including without limitation, all promissory notes and security agreements (the "**Petersen Guaranteed Obligations**");

WHEREAS, ACF contends that in exchange for accommodations by ACF to the Borrowing Debtors, TD Venture executed that certain Continuing Guaranty (Secured by Deed of Trust) dated November 15, 2018 (together with all amendments, restatements, supplements and other modifications thereto, the "**TD Venture Guaranty**" and, together with the Petersen Guaranty, the "**Guaranties**"), whereby TD Venture agreed to guarantee the Borrowing Debtors' obligations under the Loan, the Loan Agreement and all other Loan Documents (the "**TD Venture Guaranteed Obligations**" and, together with the Petersen Guaranteed Obligations, the "**Guaranteed Obligations**");

WHEREAS, TD Venture is an affiliate of the other Debtors, however, TD Venture has no employees, nor does it install any roofing/solar projects;

WHEREAS, the obligations under the Petersen Guaranty are secured by (i) that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by J. Petersen and Tricia Yeh Petersen ("**T. Petersen**" and, together with J. Petersen, the "**Trustors**") in favor of Lender (the "**Truckee Deed of Trust**"), encumbering that certain property located in the County of Placer, State of California, more particularly described in the Truckee Deed of Trust (the "**Truckee Property**"), and (ii) that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by the Trustors in favor of Lender (the "**Aptos Deed of Trust**"), encumbering that certain property located in the County of Santa Cruz, State of California, more particularly described in

the Aptos Deed of Trust (the "**Aptos Property**" and, together with the Truckee Property, the "**Trustors' Properties**");

WHEREAS, the obligations under the TD Venture Guaranty are secured by that certain Mortgage, Assignment of Rents, Security Agreement and Fixture Filing, dated November 15, 2018, granted by TD Venture in favor of Lender (the "**Hawaii Mortgage**"), encumbering that certain property located in the County of Maui, State of Hawaii, more particularly described in the Hawaii Mortgage (the "**Hawaii Property**" and, together with the Trustors' Properties, collectively the "**Properties**");

WHEREAS, TD Venture also owns an unencumbered membership interest in the Calistoga Ranch Club, a California Nonprofit Mutual Benefit Corporation, specifically identified as being Membership No. 035 (the "**Membership Interest**");

WHEREAS, the Loan is currently in default under the Loan Documents. The various defaults alleged by the Lender, as well as various allegations of improprieties that they have made against J. Petersen, are set forth in detail in the *Declaration of Andres Pinter* [Dkt. 45, Case no. BK-S-20-12814-mkn]. The Lender has also opposed the Debtors' use of cash collateral on a final basis pursuant to that certain *Secured Creditor ACF Finco I, LP's Opposition to Final Order on Emergency First Day Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361, 362, 363 and 552 and Fed. R. Bankr. P. 4001(b) and 4001(d): (I) Determining Extent of Cash Collateral; (II) Authorizing Borrowing Debtors to Use Cash Collateral and Provide Adequate Protection; (III) Granting Related Relief; and (IV) Scheduling Final Hearing* [Dkt. 440, Case no. BK-S-20-12814-mkn];

WHEREAS, on July 31, 2010, the Bankruptcy Court entered its *Final Order (I) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (II) Granting Adequate Protection Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code, (III) Granting Liens and Superpriority Claims, and (IV) Modifying the Automatic Stay, And (V) Scheduling a Final Hearing* [Dkt. 601, Case no. BK-S-20-12814-mkn] (the "**Cash Collateral Order**");

WHEREAS, as of the Petition Date, ACF was owed approximately Twenty-Eight Million Five Hundred Forty-Three Thousand Eight Hundred Fifty-Four Dollars ($28,543,854) plus professional fees and costs (the "**ACF Secured Claim**"), which sum is secured by a valid, perfected and enforceable first priority security interest in the Collateral;

WHEREAS, after considerable negotiations, Trustors, TD Venture and ACF (collectively, the "**Settling Parties**") determined that it is in their best interests to settle all of their respective disputes and controversies, including all of the Guaranteed Obligations and cash collateral disputes, and the Settling Parties executed that certain Settlement Agreement and Release of All Claims (the "**Settlement Agreement**"), which subject to the Bankruptcy Court's approval with respect to TD Venture, resolves all disputes between the Settling Parties, including the Guaranteed Obligations;

3

WHEREAS, on June 27, 2020, the Unites States Trustee appointed the Committee for Debtors Red Rose, PD Solar, PDI, PD Hawaii, PD Roofing and PD Texas, which Committee is comprised of the following entities (i) ABC Supply Company, Inc.; (ii) Beacon Sales Acquisition, Inc.; (iii) DJ Roof and Solar Supply, LLC, (iv) Export Development Canada/Exportations et Developpment Canada; (v) Fabian Covarrubias as Class Actions Representative; (vi) National Union Fire Insurance Company of Pittsburgh, Pa.; and (vii) Sterling National Bank, whose claims have been declared by the Committee to total approximately One Hundred Million Dollars ($100,000,000), with an overall creditor body owed approximately Two Hundred Fifty Million Dollars ($250,000,000);

WHEREAS, on August 19, 2020, the Debtors filed that certain *Debtors' Motion for Approval of Compromise, Pursuant to Fed. R. Bankrk. P. 9019, by and among TD Venture Fund, LLC, James P. Petersen, Tricia Yeh Petersen and ACF Finco I, LP* [Dkt. 739, Case no. BK-S-20-12814-mkn] (the "**TD Venture 9019 Motion**");

WHEREAS, on August 26, 2020, the Committee was appointed in the TD Venture chapter 11 case pursuant to that certain *Amended Notice of the Official Committee of Unsecured Creditors for the Estates of all Captioned Debtors*;

WHEREAS, the Committee has objected to the TD Venture 9019 Motion filing that certain *Objection of Official Committee of Unsecured Creditors to Debtors' Motion for Approval of Compromise, Pursuant to Fed. R. Bankrk. P. 9019, by and among TD Venture Fund, LLC, James P. Petersen, Tricia Yeh Petersen and ACF Finco I, LP* on September 9, 2020 [Dkt. 954, Case no. BK-S-20-12814-mkn] (the "**Committee Objection**");

WHEREAS, the Debtors have continued to engage in extensive marketing efforts for the sale of substantially all of the Debtors' assets;

WHEREAS, on October 12, 2020, the Debtors and ACF have entered into a non-binding Letter of Intent (the "**Letter of Intent**") to purchase substantially all of the assets of Debtors (the "**Assets**"), except those certain assets of Debtors specifically identified as, and agreed by the parties to be, excluded assets in a definitive asset purchase agreement containing terms and conditions satisfactory to the Debtors and ACF (the "**Stalking Horse Agreement**"), under Section 363 of the Bankruptcy Code, free and clear of any interest in such property other than the DIP Factoring and DIP Liens, as such terms are defined in the Letter of Intent (the "**363 Sale**").  Without limiting the foregoing, the Assets being sold pursuant to the 363 Sale shall include, without limitation, all Debtors' bankruptcy estates' claims and causes of action under Chapter 5 of the Bankruptcy Code (e.g., preference, fraudulent conveyance and avoidance actions and claims), and all other claims and causes of action that constitute property of Debtors' bankruptcy estates under Section 541 of the Bankruptcy Code, and/or any other applicable federal or state law, and all proceeds and rights to proceeds therefrom (collectively, the "**Chapter 5 Claims**");

WHEREAS, the Debtors have a limited liquidity window within which to continue to market and sell their assets as a going concern, and the terms for the Stalking Horse

4

Agreement require the Debtors to maintain their business as a going concern through the date of closing of the proposed 363 Sale of the Assets;

WHEREAS, the Debtors' business and financial position has substantially deteriorated during the pendency of the Bankruptcy Case and given the exigent circumstances surrounding the Debtors, the Parties are extremely concerned that the Debtors will be required to liquidate through chapter 7 proceedings which will not maximize value for creditors if an auction is not conducted immediately for a 363 Sale of the Debtors' Assets in accordance with the timeline set forth in the Letter of Intent;

WHEREAS, after significant negotiations among the Debtors, the Committee and ACF, the Parties have determined it is in their collective best interests to come to an agreement with respect to the treatment of the ACF Secured Claim, the Unsecured Creditors Claims and the various disputes among the Parties in the Bankruptcy Case, including without limitation, with respect to the TD Venture 9019 Motion and the Committee Objection, and each of the Parties now desire to resolve any and all such disputes and have agreed upon treatment of their respective claims, pursuant to the terms and conditions set forth in this Agreement; and

WHEREAS, as part of the negotiations among the Parties, the Committee has further determined it is in the Committee's best interests to support the 363 Sale of the Assets pursuant to the Stalking Horse Agreement, pursuant to the terms and conditions set forth in this Agreement.

## <u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, subject to entry of a final Bankruptcy Court order approving this Agreement ("**Final Settlement and Sale Support Order**"), ACF, the Debtors, on behalf of themselves and the Debtors' bankruptcy estates, and the Committee, agree as follows:

1.    <u>Recitals</u>. The foregoing Recitals are true and correct and are incorporated herein by this reference.

2.    <u>Compromise and Settlement of Claims and Support of 363 Sale</u>.

(a)    This Agreement is entered into for the purpose of resolving the disputes and allegations arising out of, in connection with or relating to ACF's and the Committee's respective claims in the Bankruptcy Case, and any other alleged claims or causes of action between the Parties, and for the purpose of supporting the 9019 Motion and a 363 Sale of the Assets pursuant to the Stalking Horse Agreement.

(b)    Nothing herein shall be construed as an admission of fault or liability on the part of any of the Parties, or of any other person or business entity, save and except for the

obligations set forth in this Agreement. The Parties acknowledge that the execution of this Agreement effects the settlement of disputed claims amongst the Parties hereto.

3.    <u>Support of 363 Sale</u>. The Committee and the Debtors shall support ACF's credit bid right to purchase the Assets by way of the 363 Sale, on the terms and conditions contemplated under the Letter of Intent and, the Stalking Horse Agreement, once executed and approved by the Bankruptcy Court pursuant to the Sale Order, as defined in the Letter of Intent. The Committee agrees to affirmatively support the sale of the Assets by way of the 363 Sale, and shall not object to ACF's credit bid right, as more specifically set forth in the Letter of Intent, nor to an accelerated timeline to conduct the auction for the 363 Sale. Without limiting the foregoing, the Committee agrees to affirmatively support the sale motion and the motion for the Bid Procedures Order, as defined in subsection (b) below, and shall not file an objection to, the auction process under the 363 Sale, ACF's credit bid under the Stalking Horse Agreement, ACF's right to overbid as provided in the Bid Procedures Order, and the Assets subject to the 363 Sale as more particularly set forth in subsection (a) below. The Committee reserves the right to object to any irregularities in the operation of the auction if the same is not conducted in accordance with the Bid Procedures Order.

(a)    <u>Assets</u>.

(i)    It is acknowledged and agreed by the Parties that the Assets to be purchased shall exclude those certain assets of Debtors specifically identified as, and agreed by ACF and the Debtors, to be excluded assets in the Stalking Horse Agreement; provided, however, it is agreed that the consumer solar business of the Debtors, together with the accounts receivable for such consumer solar business (the "**Consumer Business Assets**") shall be excluded from the 363 Sale.

(ii)    The Assets being purchased by ACF, or its permitted assignee, under the Stalking Horse Agreement shall include the Chapter 5 Claims.

(iii)    An independent sale process for the Consumer Business Assets may be conducted by the Debtors and/or the Committee along with the 363 Sale, at their discretion and their own expense.

(b)    <u>Terms of ACF's Credit Bid/Stalking Horse Agreement</u>.

(i)    It is acknowledged and agreed by the Parties that the Stalking Horse will contain a due diligence period of thirty (30) days, with a unilateral right to extend such due Agreement diligence period by ACF for an additional ten (10) day period ("**Due Diligence Period**"). ACF shall have the right to terminate the Stalking Horse Agreement any time prior to the expiration of the Due Diligence Period, provided, however, ACF agrees that its right to terminate shall be exercised, if at all, at least three (3) business days prior to the sale bid deadline set forth in the Bid Procedures Order.

(ii)    It is acknowledged and agreed by the Parties that a condition to ACF's purchase of the Assets under the Stalking Horse Agreement shall be an agreement by the DIP Factor to continue the financing being provided under the DIP Factoring to ACF for a period

of one (1) year after the closing of the purchase of the Assets by ACF, or its assignee, as more particularly set forth in the Letter of Intent.  For purposes of this Agreement, the consummation of the purchase of the Assets pursuant to the Stalking Horse Agreement under the 363 Sale by ACF, or its assignee, may be referred to as the "**ACF 363 Sale Transaction**."

(iii)    ACF's minimum credit bid shall be equal to Ten Million ($10,000,000) of its outstanding Loan to Debtors and shall include a Two Hundred Fifty Thousand Dollars ($250,000) cash component.

(iv)    For purposes of ACF's credit bid, the Hawaii property will have an estimated value equal to the averages of the brokers' opinions of value obtained by the Committee and ACF, subject to an offset in the amount of ACF's payments of debt service on the senior loan on the Hawaii Property plus the amount of the estimated carry costs of the Hawaii Property, which carry costs shall include payment of the debt service on the senior loan on the Hawaii Property, costs and expenses for security and maintenance, costs and expenses for the liquidation of the Hawaii Property, but shall be subject to any adjustment for any rental income actually received by ACF from the Hawaii Property.

(v)    The Assets being purchased at the 363 Sale shall be sold free and clear of any interest in such property other than the DIP Factoring and DIP Liens, and the sale order to be sought by Debtors approving the 363 Sale shall have been entered by the Bankruptcy Court in a form reasonably acceptable to ACF, or its permitted assignee (the "**Purchaser**"), and Debtors, and shall include a finding that the Purchaser is a good faith purchaser under Section 363 of the Bankruptcy Code.

(vi)    ACF shall be entitled to the following bid protections, to be contained in the proposed bid procedure order (the "**Bid Procedures Order**"): (i) the bid procedures to be employed and contained in the Bid Procedures Order for any possible overbid shall be standard and customary and shall be acceptable to the Purchaser, and the DIP Factor, as defined in the Letter of Intent, (ii) the Bid Procedures Order shall allow Purchaser a reasonable opportunity to further bid up to a maximum credit bid amount of Fifteen Million Dollars ($15,000,000.00) of Purchaser's outstanding Loan to Debtors with respect to any competing overbid, provided that in any given instance of an overbid by Purchaser, Purchaser shall not lose any of the bid protections set forth in the Bid Procedures Order, (iii) there can be no assurances that the DIP Factor will consent to the assumption of the DIP Factoring or provide further financing under the DIP Factoring to any other bidder, and (iv) unless otherwise specifically agreed to by Purchaser, Debtors may not accept any competing bid for the Assets unless such competing bid (A) is made in compliance with the Bid Procedures Order, (B) includes a deposit equal to an amount of not less than ten percent (10%) of the purchase price in the bid, and (C) exceeds the amount of the purchase price being paid under the Stalking Horse Agreement by at least One Hundred Thousand Dollars ($100,000.00), and is no less favorable than the Stalking Horse Agreement.  The Bid Procedures Order shall further provide that subsequent overbids may only be in increments of Fifty Thousand Dollars ($50,000.00).

(c)    Proceeds from Whitcomb Note.  In the event the ACF 363 Sale Transaction occurs, any funds received by ACF upon payment of that certain promissory note in the original

principal amount of One Million Eight Hundred Thousand Dollars ($1,800,000), from James Whitcomb and Haleakala Solar, Inc., a Hawaii corporation, as maker, to Debtors, as payee, associated with the sale of certain assets of PD Hawaii under that certain Asset Purchase and Interim Management Agreement approved by the Bankruptcy Court on August 28, 2020 by that certain *Order Granting Motion of Debtor for Order Authorizing the Sale of Substantially All of its Assets Free and Clear of All Liens, Claims and Encumbrances, and For Related Relief* [Dkt. 954, Case no. BK-S-20-12814-mkn], shall be allocated among ACF and the Debtors' estates or their successors, in accordance with the following waterfall and paid within five (5) business days of receipt of such funds by ACF:

(i)      First, One Million Dollars ($1,000,000.00) to ACF;

(ii)      The next Five Hundred Thousand Dollars ($500,000) shall be split 50/50, with fifty percent (50%) of the funds received being paid to ACF or its assignee, and fifty percent (50%) of the funds received being paid to the Debtors' estates or their successors; and

(iii)      All remaining funds received over the amounts set forth in subsections (i) and (ii) above, shall be paid to ACF.

(d)      Payment of Professional Fees. In the event the ACF 363 Sale Transaction occurs, the Parties agree that allowed fees for the estate professionals, shall be paid pro rata from the Petition Date and from those certain assets identified on Exhibit "A" (the "**Identified Assets**"), and otherwise such fees, together with any additional allowed fees of the estate professionals incurred shall be paid from the assets and proceeds remaining with the Debtors' estates or their successors after the ACF 363 Sale Transaction. All fees for the above-mentioned professionals that are payable pursuant to sections 330 or 331 of the Bankruptcy Code or pursuant to the *Order Authorizing Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 331, and Fed. R. Bankr. P. 2016, Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF 660] (the "**Interim Compensation Order**") shall be paid pro rata from from the Petition Date after entry of the Final Settlement and Sale Support Order at such time as estate funds from the Identified Assets become available in accordance with the Stipulated Cash Collateral Budget, as defined in subsection (e) below.

(e)      Stipulated Cash Collateral Budget. The Parties acknowledge and agree that the Approved Budget attached as Exhibit 1 to the Cash Collateral Order is hereby replaced by that certain budget attached to this Agreement as Exhibit "B" (the "**Stipulated Cash Collateral Budget**"). From and after entry of the Final Settlement and Sale Support Order, any reference to the Approved Budget under the Cash Collateral Order in the Bankruptcy Case shall refer to the Stipulated Cash Collateral Budget.

(f)      Waiver of Carve-Out. It is further acknowledged and agreed by the Parties that in consideration for the payment of professional fees as set forth in Section 3(d) above, that the professionals retained by the Debtors and the Committee hereby waive any right to payment pursuant to the Carve-Out in the amount not to exceed Three Hundred Thousand Dollars ($300,000), as such term is defined in Section 26 of the Cash Collateral Order. Without limiting the foregoing, upon entry of the Final Settlement and Sale Support Order, the Parties agree that the Pre-

Petition Collateral, as defined in the Cash Collateral Order, shall not be subject to the Carve-Out defined therein.

4.    Foreclosure.  In the event ACF exercises its right to terminate the Stalking Horse Agreement, the Committee and Debtors, on behalf of themselves and the Debtors' estates, agree that ACF shall have the right, at ACF's option, to either foreclose on its Collateral, or upon ACF's written request, to have the Collateral, inclusive of the Chapter 5 Claims and commercial tort claims, deeded and transferred to ACF, or its assignee (the "**Foreclosure**").  The Committee and the Debtors, on behalf of themselves and the Debtors' bankruptcy estates, agree that the automatic stay, to the extent relief from the stay has not otherwise been granted to ACF under the Cash Collateral Order, is terminated with respect to ACF as to the Collateral and the Hawaii Property without the need for any further Bankruptcy Court orders.  Notwithstanding the foregoing, ACF may seek comfort orders from the Bankruptcy Court, and the Committee and the Debtors shall not file any objections to such relief provided it complies with the terms of this Agreement.  Notwithstanding the foregoing, ACF agrees that the Collateral to be foreclosed upon, or transferred to ACF, shall exclude the Consumer Business Assets.  Any Foreclosure would include a foreclosure or transfer of the Chapter 5 Claims and commercial tort claims to ACF; provided, however, any and all claims that the Debtors' estates may have against Trustors individually (the "**Petersen Claims**") shall not be part of the Collateral to be foreclosed upon, or transferred to ACF, as part of the Foreclosure.

(a)    Payment of Professional Fees.  In the event the Foreclosure occurs, the Parties agree that allowed fees for the estate professionals shall be paid pro rata from the Petition Date and from the Identified Assets, and otherwise such fees, together with any additional fees of the estate professionals incurred shall be paid from the assets and proceeds remaining with the Debtors' estates or their successors after the Foreclosure.  All fees for the above-mentioned professionals that are payable pursuant to sections 330 or 331 of the Bankruptcy Code or pursuant to the Interim Compensation Order shall be paid pro rata from from the Petition Date after entry of the Final Settlement and Sale Support Order at such time as estate funds from the Identified Assets become available in accordance with the Stipulated Cash Collateral Budget.

(b)    Waiver of Carve-Out.  It is further acknowledged and agreed by the Parties that in consideration for the payment of professional fees as set forth in Section 4(a) above, that the professionals retained by the Debtors and the Committee hereby waive any right to payment pursuant to the Carve-Out in the amount not to exceed Three Hundred Thousand Dollars ($300,000), as provided in, and as such term is defined in, Section 26 of the Cash Collateral Order.  Without limiting the foregoing, upon entry of the Final Settlement and Sale Support Order, the Parties agree that the Pre-Petition Collateral, as defined in the Cash Collateral Order, shall not be subject to the Carve-Out defined therein.

5.    Chapter 5 Claims.

(a)    The Assets being purchased by Purchaser shall include the Chapter 5 Claims, which are inclusive of Debtors' commercial tort claims.  The Parties agree that ACF shall have the right to commence and prosecute the Chapter 5 Claims and relief associated therewith in Debtors' Bankruptcy Cases, and the Final Settlement and Sale Support Order shall expressly

preserve this right.

(b)    In the event of an ACF 363 Sale Transaction, any proceeds received by ACF or its assignee on the recovery of any of the Chapter 5 Claims shall be allocated among the ACF or its assignee, and the Committee, in accordance with the following waterfall:

(i)    First, to the payment of all fees, costs and expenses incurred by or on behalf of ACF or its assignee for enforcement and collection of the Chapter 5 Claims;

(ii)    Second, Two Hundred Fifty Thousand Dollars ($250,000) shall be repaid to ACF or its assignee to repay the Liquidation Trust Seed Loan, as defined in Section 7 below, to the extent such Liquidation Trust Seed Loan has not already been repaid from other sources of recovery as identified in this Agreement;

(iii)    Third, One Million Five Hundred Thousand Dollars ($1,500,000) recovered shall be paid to ACF or its assignee; and

(iv)    Fourth, all remaining recoveries over the amounts set forth in subsections (i), (ii) and (iii) above, shall be split 50/50, with fifty percent (50%) of the recovered amounts being paid to ACF or its assignee, and fifty percent (50%) of the recovered amounts being paid to the Debtors' estates or their successors.

(c)    In the event of a Foreclosure and subsequent acquisition by ACF as a part of such Foreclosure of the Chapter 5 Claims, which are inclusive of Debtors' commercial tort claims but exclusive of any Petersen Claims, any proceeds received by ACF or its assignee on the recovery of any of the Chapter 5 Claims shall be allocated among the ACF or its assignee, and the Committee, in accordance with the following waterfall:

(i)    First, to the payment of all fees, costs and expenses incurred by or on behalf of ACF or its assignee for enforcement and collection of the Chapter 5 Claims;

(ii)    Second, Two Hundred Fifty Thousand Dollars ($250,000) shall be repaid to ACF or its assignee to repay the Liquidation Trust Seed Loan, to the extent such Liquidation Trust Seed Loan has not already been repaid from other sources of recovery as identified in this Agreement;

(iii)    Third, the next Four Million Dollars ($4,000,000) of recoveries shall be split 90/10, with ninety percent (90%) of the recovered amounts being paid to ACF or its assignee, and ten percent (10%) of the recovered amounts being paid to the Debtors' estates or their successors; and

(iv)    Fourth, all remaining recoveries over the amounts set forth in subsections (i), (ii) and (iii) above, shall be split 75/25, with seventy-five percent (75%) of the recovered amounts being paid to ACF or its assignee, and twenty-five percent (25%) of the recovered amounts being paid to the Debtors' estates or their successors.

(d)     All funds to be paid under this <u>Section 5</u> shall be paid within five (5) business days of receipt of such funds by any Party.

6.     <u>Support of TD Venture 9019 Motion; Hawaii Property</u>.

(a)     Immediately upon entry of a written order by the Bankruptcy Court approving the 9019 Settlement and Sale Support Motion, provided no objections were made to the 9019 Settlement and Sale Support Motion or all such oppositions are resolved and/or withdrawn at the hearing on the 9019 Settlement and Sale Support Motion, the Committee shall withdraw the Committee Objection and agree to affirmatively support the TD Venture 9019 Motion and transactions completed under the Settlement Agreement.   In the event any oppositions made to the 9019 Settlement and Sale Support Motion were not so resolved or withdrawn prior to such entry of the written order by the Bankruptcy Court, then the Committee shall withdraw the Committee Objection and agree to affirmatively support the TD Venture 9019 Motion and transactions completed under the Settlement Agreement, at such time as the written order by the Bankruptcy Court  approving the 9019 Settlement and Sale Support Motion becomes a final, non-appealable order.

(b)     Upon approval by the Bankruptcy Court of the TD Venture 9019 Motion, the Hawaii Property will be transferred to ACF or its assignee, as provided for under the Settlement Agreement.  The net proceeds from the subsequent liquidation of the Hawaii Property by ACF or its assignee will be allocated as set forth in subsections (c) or (d) below, as applicable, after all transaction and closing fees and costs from the sale of the Hawaii Property are paid, including reimbursement and payment for the carry costs of the Hawaii Property, which carry costs shall include reimbursement to ACF for payment of the debt service on the senior loan on the Hawaii Property and costs and expenses for security and maintenance, but shall be subject to any adjustment for any rental income actually received by ACF from the Hawaii Property (the "**Hawaii Property Net Proceeds**").

(c)     In the event the ACF 363 Sale Transaction occurs, the Hawaii Property Net Proceeds shall be allocated among ACF, or its assignee, and the Committee, in accordance with the following waterfall:

(i)     The first Four Million Dollars ($4,000,000) to ACF, or its assignee;

(ii)     The next Five Hundred Thousand Dollars ($500,000) shall be split 50/50, with fifty percent (50%) of the amount being paid to ACF or its assignee, and fifty percent (50%) of the amount being paid to the Debtors' estates or their successors; and

(iii)     All remaining Hawaii Property Net Proceeds over the amounts set forth in subsections (i) and (ii) above, shall be paid to ACF, or its assignee.

(d)     In the event the Foreclosure occurs, the Hawaii Property Net Proceeds shall be allocated among ACF, or its assignee, and the Committee, in accordance with the following waterfall:

11

(i)    The first Three Million Five Hundred Thousand Dollars ($3,500,000) to ACF, or its assignee; and

(ii)    All remaining Hawaii Property Net Proceeds shall be split 50/50, with fifty percent (50%) of the amount being paid to ACF or its assignee, and fifty percent (50%) of the amount being paid to the Debtors' estates or their successors.

(e)    All funds to be paid under this Section 6 shall be paid within five (5) business days of receipt of such funds by any Party.

7.    Liquidating Trust.

(a)    Upon entry of the Final Settlement and Sale Support Order by the Bankruptcy Court, Debtors shall prepare a liquidating plan of reorganization and disclosure statement, in form and substance satisfactory to the Debtors, the Committee and ACF, in their reasonable discretion (the "Plan"), which Plan shall ratify 9019 Settlement and Sale Support Order, as defined in Section 8 below.    The Plan shall establish a liquidating trust (the "Liquidating Trust") pursuant to a liquidating trust agreement in form and substance satisfactory to the Debtors, the Committee and ACF, in their reasonable discretion.    The Plan will provide that any assets remaining in the Debtors' estates after the ACF 363 Transaction as of the time the Plan goes effective will be transferred to the Liquidating Trust.    The Liquidating Trust shall serve as the successor to the Debtors' estates.    Provided the Plan proponent complies with Sections 1125 and 1126 of the Bankruptcy Code and so long as the Plan maintains the Release of Claims and is otherwise in compliance with this Agreement, ACF agrees to support the prosecution and vote in favor of the Plan.

(b)    Upon establishment of the Liquidating Trust pursuant to an approved Bankruptcy Court order, ACF shall loan the Liquidating Trust Two Hundred Fifty Thousand Dollars ($250,000) in order to initially fund the Liquidating Trust (the "Liquidating Trust Seed Loan"), which shall be repaid only from the sources of recovery set forth in Sections 5(b) and 5(c) above.

(c)    The amount of ACF's Secured Claim that does not become part of the ACF credit bid or the amount determined satisfied for purposes of the Foreclosure, as more particularly set forth in this Agreement, shall be treated as an unsecured claim in the Bankruptcy Case (the "ACF Unsecured Claim").    The ACF Unsecured Claim shall be offset by the Hawaii Property Net Proceeds allocated to ACF pursuant to Section 6 above.

(d)    In the event of an ACF 363 Sale Transaction, the following provisions shall apply:

(i)    ACF agrees to subordinate the ACF Unsecured Claim to all other allowed general unsecured claims in the Bankruptcy Case, except to the extent of any agreed payments of proceeds or recoveries specifically set forth in this Agreement and except as to any recovery under the Petersen Claims, which shall be split 50/50, with fifty percent (50%) of the

amount being paid to ACF or its assignee, and fifty percent (50%) of the amount being paid to the Debtors' estates or, upon the confirmation of the Plan, the Liquidating Trust.

(ii)     Without limiting the foregoing, in the event of an ACF 363 Sale Transaction, ACF shall not participate in any recoveries received by, or distributions to be made from the Liquidating Trust, except to the extent of any agreed payments of proceeds or recoveries specifically set forth in this Agreement and except as to any recovery under the Petersen Claims, subject to any pro-rata distribution made to ACF on account of the ACF Unsecured Claim, to the extent any funds are available for distribution to the ACF Unsecured Claim.

(iii)     Any additional amounts or recoveries received by the Debtors' estates or the Liquidating Trust from the Trustors shall be split 50/50, with fifty percent (50%) of the amount being paid to ACF or its assignee, and fifty percent (50%) of the amount being paid to the Debtors' estates or, upon confirmation of the Plan, the Liquidating Trust.

(e)     In the event of a Foreclosure, the following provisions shall apply:

(i)     None of the proceeds received by the Debtors' estates or the Liquidating Trust on the recovery of any of the Petersen Claims shall be allocated to ACF, subject to any pro-rata distribution made to ACF on account of the ACF Unsecured Claim, to the extent any funds are available for distribution to the ACF Unsecured Claim.

(ii)     The Debtors or the Liquidating Trust (as applicable) and ACF shall enter into a funding, prosecution and sharing agreement with respect to the funding, control and allocation of recoveries of the claims to be held by the Debtors' estates or the Liquidating Trust (as applicable), which include D&O covered claims and the Petersen Claims, which agreement shall specifically provide that [ACF maintains control over the commencement and prosecution of the Chapter 5 Claims, at ACF's sole discretion] and shall allocate the split with respect to recoveries received by the Debtors' estates or the Liquidating Trust between the Debtors' estates or the Liquidating Trust (as applicable) and ACF, and shall otherwise be in form and substance acceptable to the Debtors and the Committee or, upon confirmation of the Plan, the Liquidating Trust and ACF, in their reasonable discretion.

8.     Conditions of Settlement.

(a)     The Parties shall each execute this agreement and deliver an executed copy to the other Parties on or before October 28, 2020.

(b)     Debtors shall file a motion to approve this Agreement under Bankruptcy Rule 9019 of the Bankruptcy Code, no later than October 28, 2020, in form and substance satisfactory to the Debtors, the Committee and ACF, in their reasonable discretion (the "**9019 Settlement and Sale Support Motion**"), which the Parties agree to be heard on shortened notice.

(c)    The Final Settlement and Sale Support Order, in form and substance satisfactory to the Debtors, the Committee and ACF, in their reasonable discretion, shall have been entered by the Bankruptcy Court, no later than November 13, 2020.

9.    <u>Conditions Subsequent</u>.    As a condition subsequent to the effectiveness of this Agreement, the TD Venture 9019 shall have been approved by the Bankruptcy Court and shall remain unstayed thereafter.

10.    <u>Representations and Warranties of the Debtors</u>.  As a material inducement for the Parties to enter into this Agreement, the Debtors hereby represent and warrant to the other Parties that:

(a)    Each Debtor is duly organized, validly existing and in good standing under the laws of the State of its respective organization.  Subject to approval of this Agreement by the Bankruptcy Court, each Debtor has full power and authority (and all necessary action has been taken) to execute, deliver and perform its obligations under this Agreement, and upon entry of the Final Settlement and Sale Support Order by the Bankruptcy Court, this Agreement will be binding upon and enforceable against each Party in accordance with its terms;

(b)    The Debtors own their Claims being released under <u>Section 13</u>, the Debtors' Claims have not been pledged, hypothecated, sold, assigned, or otherwise transferred to any person or entity, and the Debtors have all rights, power and authority to settle the Debtors' Claims and grant the releases contained in this Agreement;

(c)    The Debtors have not assigned nor transferred to any person or entity any matter released in <u>Section 13</u> of this Agreement or any part or portion of any matter released in <u>Section 13</u> of this Agreement, and all claims, defenses, rights and obligations and causes of action asserted or the subject of this Agreement are in fact owned by them.  The Debtors enter into this Agreement with the intention, upon approval of the Bankruptcy Court, of binding themselves, their successors, predecessors, subsidiaries, affiliates, partners, employees, assigns, attorneys, agents and all others who may claim under, through or in connection with each, and the Debtors' bankruptcy estates.

11.    <u>Representations and Warranties of ACF</u>.  As a material inducement for the Parties to enter into this Agreement, ACF hereby represents and warrants to the other Parties that ACF is duly organized, validly existing and in good standing under the laws of the State of its organization.  ACF has full power and authority (and all necessary action has been taken) to execute, deliver and perform its obligations under this Agreement, and this Agreement will be binding upon and enforceable against ACF in accordance with its terms.

12.    <u>Representations and Warranties of the Committee</u>.  As a material inducement for the Parties to enter into this Agreement, the Committee hereby represents and warrants to the other Parties that each member of the Committee is duly organized, validly existing and in good standing under the laws of the State of its respective organization.  Subject to approval of this Agreement by the Bankruptcy Court, the Committee has full power and authority (and all necessary action has been taken) to execute, deliver and perform its obligations under this Agreement, and upon entry of the Final Settlement and Sale Support Order  by the Bankruptcy

Court, this Agreement will be binding upon and enforceable against the Committee in accordance with its terms.

13.    Release of Claims.

(a)    Release of Claims.  Effective immediately upon entry of the Final Settlement and Sale Support Order by the Bankruptcy Court, the Debtors and the Debtors' bankruptcy estates, and all those claiming through them or on their behalf, including, but not limited to, trustees, officers, directors, owners, shareholders, parents, subsidiaries, affiliates, members, partners, managers, employees, personal representatives, clients, attorneys, agents, spouses (current or former), executors, successors, or assigns (the "**Releasing Parties**"), hereby release, acquit, relieve and forever discharge ACF, and its trustees, officers, directors, owners, shareholders, parents, subsidiaries, affiliates, members, partners, managers, employees, personal representatives, clients, attorneys, agents, spouses (current or former), executors, successors, or assigns (the "**Released Parties**") from, and covenant not to directly or indirectly sue for or otherwise assert against the Released Parties, in any forum, any and all claims, rights, actions, complaints, demands, causes of action, obligations, promises, contracts, covenants, agreements, controversies, suits, debts, expenses, damages, liens, attorneys' fees, costs, losses, judgments, costs of litigation and suits, interests, orders and/or liabilities of any nature whatsoever, whether arising at law or equity, whether or not now known, asserted or non-asserted, suspected or unsuspected, pending or threatened, matured or unmatured, fixed or contingent (collectively, "**Claims**"), which the Releasing Parties had, now have, or may claim to have against the Released Parties (either directly or indirectly), arising out of, or related to Claims asserted or which could have been asserted with respect to such Releasing Party's Claims in the Bankruptcy Case, or in any other action or proceeding, or any other act, event, occurrence, or matter whatsoever related to (i) the settlement of the Claims, (ii) the Bankruptcy Case, and/or (iii) the relationship and/or alleged relationship between the Releasing Parties and the Released Parties with regard to the Claims asserted or which could have been asserted with respect to such Releasing Party's Claims in the Bankruptcy Case (the "**Release of Claims**").

(b)    Acknowledgement of the Parties.  Each Releasing Party acknowledges and represents the following: it has had the benefit and advice of independent legal counsel in connection with this Agreement; this Agreement is the result of negotiation between the Parties, each of whom has participated in the drafting of this Agreement, through its respective attorneys; it has freely and voluntarily entered into this Agreement; it has reviewed this Agreement in its entirety; it understands the meaning of each term of this Agreement and the consequences of signing this Agreement; it has relied wholly upon its own judgment, belief, knowledge, investigation, independent legal advice, and research as to the advisability of entering into this Agreement; it, together with its attorneys, has made such investigation of the facts and the law pertaining to the Claims, this Agreement, and all related matters as it deems necessary; and it has not been influenced to any extent whatsoever in entering into this Agreement by any representations or statements regarding the same by any other Party or by anyone representing or acting for any other Party.

Each Releasing Party understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Party now knows or believes to exist regarding

the subject matter of the Release of Claims contained in this <u>Section 13</u>, and which, if known at the time of signing this Agreement, may have materially affected this Release of Claims and such Releasing Party's decision to enter into it and grant the Release of Claims contained in this <u>Section 13</u>. Nevertheless, the Releasing Parties intend to fully, finally, and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the Release of Claims contained in this <u>Section 13</u>, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the Release of Claims given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasing Parties hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. The Releasing Parties have been made aware of, and understand, the provisions of California Civil Code Section 1542 ("**Section 1542**"), which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." The Releasing Parties expressly, knowingly, and intentionally waive any and all rights, benefits, and protections of Section 1542 and of any other state or federal statute or common law principle limiting the scope of a general release.

14.    <u>Exclusions from Release of Claims.</u>  Notwithstanding anything in this Agreement to the contrary, the Releasing Parties expressly agree that the scope of the Release of Claims does not extend to any and all claims arising from a breach of any duty or obligation imposed on any of them pursuant to this Agreement or that may arise after the Effective Date.

15.    <u>Good Faith Compliance; Further Assurances</u>. Each Party hereto agrees to cooperate in good faith and to do all things necessary to effectuate this Agreement. Each Party hereto agrees to execute such other documents as may be reasonably requested by any other Party to effectuate the terms of this Agreement.

16.    <u>Binding Agreement</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto as well as their respective affiliates, subsidiaries, assigns, officers, directors, members, managers, employees, representatives, administrators, executors, agents, all successors-in-interest, and those persons in active concert or participation with them. The Parties' rights or obligations under this Agreement shall not be assigned without the consent of the other Parties, which consent shall not be unreasonably withheld.

17.    <u>Governing Law; Jurisdiction</u>. The internal laws of the State of Nevada applicable to contracts made and wholly performed therein shall govern the validity, construction, performance and effect of this Agreement. Each of the Parties hereby irrevocably and unconditionally agrees that any legal action, suit, dispute or proceeding arising under, out of or in connection with this Agreement shall be brought in the Bankruptcy Court (for so long as the Bankruptcy Court has jurisdiction) and otherwise in the Federal or State courts of competent jurisdiction located in the County of Clark, State of Nevada, and each of the Parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of such courts, generally and unconditionally, and waives any objections as to venue or inconvenient forum. Notwithstanding

16

the foregoing consent to jurisdiction, so long as the Bankruptcy Court has jurisdiction, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any matter under or arising out of or in connection with this Agreement, and hereby submits to the jurisdiction of the Bankruptcy Court.

18.     Attorney's Fees.  Except as otherwise set forth herein, all Parties shall bear their own attorney's fees and costs through the execution of this Agreement.

19.     Entire Agreement. This Agreement contains the complete and entire understanding and agreement between the Parties with respect to the subject matter of this Agreement and there are no representations, warranties, promises, or undertakings other than those contained herein.  As to the subject matter hereof, this Agreement supersedes and cancels all previous agreements between the Parties hereto.

20.     Waiver.  No course of conduct or dealing between the Parties shall act as a modification or waiver of any provision of this Agreement, and no waiver or modification of any of the terms or provisions of this Agreement shall be valid, unless contained in a single written document signed by all Parties.  No waiver of any breach or any covenant or provision contained herein will be deemed a waiver of any preceding or succeeding breach thereof, or of any other covenant or provision contained herein.

21.     Counterparts; Electronic Signatures.  This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement.  Signatures transmitted and delivered by facsimile or e-mail transmission shall have the same force and effect as original signatures.

22.     Severability. If any provision of this Agreement is deemed by a court of competent jurisdiction to be illegal, invalid or unenforceable under present or future laws, it is the intention of the Parties that the remainder of the Agreement shall not be affected thereby, and each remaining term and provision of this Agreement will be valid and be enforced to the fullest extent permitted by law, and to the extent permitted and possible, the illegal, invalid or unenforceable term shall be deemed replaced by a term that is legal, valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

23.     No Third Party Beneficiaries.  Except as expressly provided in this Agreement, nothing in this Agreement shall be construed to give any person, other than the Parties, their successors, and their permitted assigns, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

24.     Drafting. All of the provisions of this Agreement will be deemed to have been drafted jointly by the Parties hereto, with each Party equally responsible for the choice of words and form of this Agreement.  No provision of this Agreement is to be interpreted for or against any Party because that Party or its legal representative drafted such provision.

25.   <u>__WAIVER OF JURY TRIAL__</u>.  **EACH PARTY HERETO WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

26.   <u>Headings</u>.  Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

27.   <u>Attorney Representation</u>.   In negotiation, preparation and execution of this Agreement, the Parties hereby acknowledge that each Party has been represented by its own counsel and that each Party has had an opportunity to consult with an attorney of its own choosing prior to the execution of this Agreement and has been advised that it is in its best interests to do so.  The Parties have read this Agreement in its entirety and fully understand the terms and provisions contained herein. The Parties execute this Agreement freely and voluntarily and accept the terms, conditions and provisions of this Agreement, and state that the execution by each of them of this Agreement is free from any coercion whatsoever.

28.   <u>Survival</u>. The representations and warranties made herein, as well as the other promises on the part of the Parties set forth herein, shall survive the execution of this Agreement.

29.   <u>Notices</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed given: (i) when sent by electronic mail, unless a failure of delivery message is received by the sender; (ii) the next business day after sent by Airborne, Federal Express, or a comparably reliable national air courier service (i.e., one which delivers service in at least 48 states) provided that any such courier service provides written evidence of delivery; and (iii) three (3) business days after deposited in the United States Mail, postage prepaid, Registered or Certified Mail, Return Receipt Requested, addressed to the parties hereto at the respective addresses specified herein, or at such other addresses as they have theretofore specified by written notice delivered in accordance herewith.

| | |
|---|---|
| If to ACF: | ACF Finco I LP |
| | c/o Ares Management LLC |
| | 800 Corporate Pointe, 3rd Floor |
| | Culver City, CA 90230 |
| | |
| With a copy to: | Garman Turner Gordon |
| | 7251 Amigo Street, Suite 210 |
| | Las Vegas, Nevada 89119 |
| | Attn:  Greg Garman, Esq. and Christine Murphy, Esq. |
| | E-mail:  ggarman@gtg.legal and cmurphy@gtg.legal |
| | |
| If to the Debtors: | Petersen-Dean Inc., et. al. |
| | 4309 Hacienda Drive, Suite 350 |
| | Pleasanton, CA  94588 |
| | Attn:  George Milionis |
| | E-mail:  gmilionis@petersendean.com |

With a copy to:              Fox Rothschild, LLP
                             1980 Festival Plaza Drive, Suite 700
                             Las Vegas, NV 89135
                             Attn:  Brett Axelrod, Esq.
                             E-mail:  BAxelrod@foxrothschild.com

If to the Committee:         _____
                             _____
                             _____
                             Attn:  _____
                             E-mail:  _____

With a copy to:              Brown Rudnick LLP
                             2211 Michelson Drive
                             Seventh Floor
                             Irvine, CA 92612
                             Attn:  Cathrine M. Castaldi, Esq.
                             E-mail:  ccastaldi@brownrudnick.com

And:                         Schwartz Law, PLLC
                             601 East Bridger Avenue
                             Las Vegas, NV 89101
                             Attn:  Samuel A. Schwartz, Esq.
                             E-mail:  SASchwartz@nvfirm.com

[Signature Pages to Follow.]

The Parties have executed this Agreement as of the 28th day of October, 2020

ACF:

ACF FINCO I LP

By: _____
Its: _____
Print Name: _____


DEBTORS:

Petersen-Dean, Inc.
Beachhead Roofing & Supply, Inc.
California Equipment Leasing Association, Inc.
Solar 4 America, Inc.
Fences 4 America, Inc.
James Petersen Industries, Inc.
PD Solar, Inc.
Sonoma Roofing Services, Inc.
Petersen Roofing and Solar LLC
PetersenDean Texas, Inc.
Red Rose, Inc.
Roofs 4 America, Inc.
Tri-Valley Supply, Inc.
Petersen Dean Hawaii LLC
Petersen Dean Roofing and Solar Systems, Inc.
TD Venture Fund, LLC

By: _____
Name: George K. Milionis
Its:  General Cousel


Committee:


By: _____
Name: Samuel A. Schwartz, Esq
Its:  Counsel

20

## LIMITED CONSENT OF DIP FACTOR TO SEGREGATION AND USE OF PROCEEDS OF IDENTIFIED ASSETS

1.        Effective upon entry of the Final Settlement and Sale Support Order, DIP Factor consents to Debtors' deposit and maintenance of the proceeds of the Identified Assets in a segregated deposit account that will be subject to DIP Factor's lien securing the Secured Obligations as defined in and according to the priority set under the *Final Order (I) Authorizing Certain Debtors to (A) Obtain Post-Petition DIP Factoring Pursuant to 11 U.S.C. § 363 and 364; (2) Grant Priming Liens and Superpriority Claims Pursuant to 11 U.S.C. § 364, and (C) Sell Accounts Free and Clear; (II) Modifying the Automatic Stay; (III) Approving Notice; and (V) Granting Related Relief* [Case No. BK-S-20-12814-mkn, Docket No. 914] (the "**Final DIP Factoring Order**").

2.        Effective upon consummation of the ACF Sale Transaction and provided that no Event of Default exists under the DIP Factoring Agreement (as defined in the Final DIP Factoring Order), DIP Factor releases its lien and claim as to, and consents to the Debtors' use of, that portion of the segregated proceeds of the Identified Assets as needed for payment of the professional fees of the Debtors' estates allowed per court order.

3.        In the event of an ACF Foreclosure under Section 4 above or if an Event of Default is existing under the DIP Factoring Agreement, then DIP Factor will provide notice of such occurrence to estate professionals and the date of such notice will commence a 120-day period in which DIP Factor will attempt to collect the Secured Obligations due DIP Factor from the Collateral (as defined in the Final DIP Factoring Order) other than the Identified Assets (the "**120-Day Period**"). DIP Factor does not hereby release its lien or claim as to the Identified Assets in the event of an ACF Foreclosure under Section 4 above or if an Event of Default is existing under the DIP Factoring Agreement.

a.        If at the end of the 120-Day Period, the Secured Obligations are not paid in full to DIP Factor, then the segregated proceeds of the Identified Assets will be applied, first, to the Secured Obligations due DIP Factor.

b.        Effective upon the end of the 120-Day Period and upon payment in full of the Secured Obligations to DIP Factor, DIP Factor waives its lien or claim to, and consents to, the Debtors' use of, any remaining portion of the segregated proceeds of the Identified Assets as needed for payment of the professional fees of the Debtors' estates allowed per court order.

4.        DIP Factor reserves and does not waive any rights under the Final DIP Factoring Order and only provides herein its limited consent to use of proceeds of the Identified Assets as stated herein.

DIP Factor:

LS DE LLC

By: _____

Name: _____Douglas Goldin_____

Title: _____General Counsel_____


LSQ Funding Group, L.C.

By: _____

Name: _____Douglas Goldin_____

Title: _____General Counsel_____

**Exhibit "A"**

**Identified Assets**

1. Consumer Business Assets;

2. Accounts Receivable due and owing from the Objecting Customers, as defined under the *Final Order Authorizing Payment of Critical Vendor Claims* [entered September 3, 2020, as Dkt. 917 in the Bankruptcy Case] as NRP Contractors II LLC, Thompson Thrift Construction, Inc., Rampart Construction Company, LLC and Rampart Multifamily, LLC, John Mourier Construction, Inc., Beazer Homes Texas, L.P., and Beazer Homes Holdings, LLC;

3. Proceeds from the auction by CA Global Partners, Incorporated, of Debtors' Assets, including solar modules, batteries, vehicles, equipment, office furniture, and other property, as defined under the *Order Authorizing: (A) Employment and Compensation of CA Global Partners, Incorporated, as Auctioneer; and (B) Sale of Solar Modules and Related Assets Free and Clear* [entered September 22, 2020, as Dkt. 1001 in the Bankruptcy Case];

4. Remaining proceeds in the approximate amount of $60,000.00 from the sale of the fifteen (15) used Vehicles, as defined under the *Order Authorizing Sale of Used Vehicles Free and Clear* [entered October 15, 2020, as Dkt. 1163 in the Bankruptcy Case];

5. Proceeds from the sale of the Batteries as defined under the *Order Authorizing Sale of Tesla Powerwall Batteries Free and Clear* [entered October 15, 2020, as Dkt. 1161 in the Bankruptcy Case]; and

6. Proceeds from the Debtors' anticipated sale through CA Global Partners, Incorporated, or other auctioneer, of fifteen vehicles and ten gradalls, lifts, and other equipment, subject to further order in the Bankruptcy Case.

23